1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JOHN REYNA,                              Case No.  1:20-cv-00203-NODJ-HBK (PC)

12              Plaintiff,                     FINDINGS AND RECOMMENDATIONS TO
                                               GRANT DEFENDANTS' MOTIONS FOR
13        v.                                   SUMMARY JUDGMENT[1]

14   KINGS COUNTY JAIL, WENDY
     BATCHELOR, and NAEEM SIDDIQI,            FOURTEEN-DAY OBJECTION PERIOD[2]
15
                Defendants.                    (Doc. Nos. 40, 41)
16

17

18            Pending before the Court are two motions for summary judgment, one filed by Defendants

19   Wendy Batchelor and Naeem Siddiqi, the other by Defendant Kings County Jail.  (Doc. Nos. 40,

20   41).  For the reasons discussed below, the undersigned recommends the district court grant

21   summary judgment to Defendant Batchelor and Siddiqi because there is no genuine dispute of

22   material facts as to whether Defendants Batchelor and Siddiqi acted with deliberate indifference

23   to Plaintiff's serious medical condition.  Because the undersigned finds no underlying

24
     _____

25   [1] This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302
     (E.D. Cal. 2022).
26   [2] On December 1, 2023, this case was assigned to the No District Judge ("NODJ") docket due to the
     elevation of District Judge Ana I. de Alba to the Ninth Circuit Court of Appeals.  This case will remain
27   pending until a new district judge is appointed or until another district judge considers these Findings and
     Recommendation.  Despite this anticipated delay, the objection period remains fourteen (14) days, absent
28   leave for an extension of time being granted.

constitutional violation by Defendants Batchelor and Siddiqi, Plaintiff's claim arising under *Monell*[3] against Defendant Kings County Jail fails.  Thus, the undersigned recommends the district court also grant summary judgment to Kings County Jail.

## I.   BACKGROUND

### A.  Procedural History

Plaintiff John Reyna is a state prisoner proceeding pro se and *in forma pauperis* in his civil rights action under 42 U.S.C. § 1983 against Defendants Kings County Jail (KCJ), Wendy Batchelor, and Naeem Siddiqi.  (Doc. No. 1, "Complaint").  On July 7, 2020, the former magistrate judge found the Complaint stated colorable claims of medical deliberate indifference against Kings County Jail, Wendy Batchelor, and Naeem Siddiqi.  (Doc. No. 6).  Defendants filed answers to the Complaint (Doc. Nos. 13, 29) and the Court entered a discovery and scheduling order.  (Doc. No. 36).  On April 19, 2023, Batchelor and Siddiqi filed a timely motion for summary judgment.  (Doc. No. 40).  On April 20, 2023, KCJ filed a timely motion for summary judgment or in the alternative for summary adjudication.  (Doc. No. 41).  On May 17, 2023, Plaintiff filed an Opposition to KCJ's MSJ (Doc. No. 43) and an Opposition to Batchelor and Siddiqi's MSJ (Doc. No. 44).  KCJ timely filed a Reply (Doc. No. 45), as did Batchelor and Siddiqi (Doc. No. 46).  Plaintiff filed a Surreply to Batchelor and Siddiqi's MSJ.  (Doc. No. 47).  The Court denied Defendants' Motion to Strike Plaintiff's Surreply.  (Doc. No. 48).

### B.  Batchelor and Siddiqi's MSJ

Supporting their MSJ, Defendants Batchelor and Siddiqi submit: (1) a memorandum of points and authorities (Doc. No. 40); (2) a statement of undisputed material facts (Doc No. 40-2); (3) the declaration of Chad C. Couchot (Doc. No. 40-3); (4) a copy of Plaintiff's Complaint (Doc. No. 40-4); (5) a copy of the Court's Screening Order in this case (Doc. No. 40-5); (5) a copy of Plaintiff's pertinent medical records (Doc. No. 40-6); and (7) the medical opinion of Dr. Alfred Joshua, MD, MBA, CCHP-P, FAAEM.  (Doc. No. 40-7).  Defendants refer to Dr. Joshua as an "expert."  (Doc. No. 40-3 at 2).

---

[3] *Monell v. Dep't of Soc. Services of City of New York*, 436 U.S. 658 (1978).

In opposition, Plaintiff submits (1) his own declaration (Doc. No. 40 at 1-4), (2) a statement of disputed factual issues (*id*. at 4-7); (3) a memorandum (*id*. at 8-10); (4) a copy of his Complaint; (5) excerpts of Plaintiff's medical records (*id*. at 19-20); (6) a copy of a document that appears to be Plaintiff's history of medical prescriptions (*id*. at 21); (7) an excerpt of a document titled "Defendants' Response to Plaintiff's Request for Admissions" (*id*. at 22); (8) a copy of a document summarizing Plaintiff's grievance at KCJ regarding discontinuation of his medication (*id*. at 23-24); (9) various medical records and progress notes pertaining to Plaintiff's medical treatment (*id*. at 25-43); (10) copies of NaphCare documents listing the job qualifications for Nurse Practitioner, Medical Director, and Full-Time Medical Director (*id*. at 44-58); (11) a copy of NaphCare's Medication Services policy (*id*. at 59-62); (12) the declaration of Chrystal Thomas (*id*. at 63-66); (13) copies of Plaintiff's medical services requests (*id*. at 67-68); (14) copies of Plaintiff's progress notes and other medical records (*id*. at 69-78); and (15) a summary of Plaintiff's grievance requesting renewal of his shoe chrono (*id*. at 79-80).

### B. Kings County Jail's MSJ

Supporting their MSJ, Defendant Kings County Jail submits: (1) a memorandum of points and authorities (Doc. No. 41-1); (2) a statement of undisputed material facts (Doc No. 41-2); (3) the declaration of Captain Chrystal Thomas (Doc. No. 41-3); and (4) the declaration of Matthew Bunting, to which is attached an excerpt of Plaintiff's deposition testimony (Doc. No. 41-4).

In opposition, Plaintiff submits: (1) his own declaration (Doc. No. 43 at 1-2); (2) an excerpt of a document marked "Defendant's Response to Plaintiff's Request for Production of Documents" (Set One) (*id*. at 3-4); and a copy of a letter to Plaintiff from defense attorney James J. Arendt dated March 9, 2023 (*id*. at 5).

## II.  APPLICABLE LAW

### A. Summary Judgment Standard

The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment

3

as a matter of law." Fed. R. Civ. P. 56(a).  Summary judgment should be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the "initial responsibility" of demonstrating the absence of a genuine issue of material fact. *Id.* at 323.  An issue of material fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

If the moving party meets its initial burden, the burden then shifts to the opposing party to present specific facts that show there to be a genuine issue of a material fact. *See* Fed R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586.  An opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 587.  The party is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that a factual dispute exists.  Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586 n.11.  The opposing party is not required to establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir. 1987).  However, "failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

The court must apply standards consistent with Rule 56 to determine whether the moving party demonstrated there is no genuine issue of material fact and showed judgment to be appropriate as a matter of law. *See Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993).  "[A] court ruling on a motion for summary judgment may not engage in credibility determinations or the weighing of evidence." *Manley v. Rowley*, 847 F.3d 705, 711 (9th Cir. 2017) (citation omitted).  The evidence must be viewed "in the light most favorable to the nonmoving party" and "all justifiable inferences" must be drawn in favor of the nonmoving

4

party. *Orr v. Bank of America*, NT & SA, 285 F.3d 764, 772 (9th Cir. 2002). A mere scintilla of evidence is not sufficient to establish a genuine dispute to defeat an otherwise properly supported summary judgment motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 252. However, where "opposing parties tell two different stories, one of which is blatantly contradicted by the record" courts "should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The Ninth Circuit has "held consistently that courts should construe liberally motion papers and pleadings filed by pro se inmates and should avoid applying summary judgment rules strictly." *Soto v. Sweetman*, 882 F.3d 865, 872 (9th Cir. 2018) (quoting *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010)). While prisoners are relieved from strict compliance, they still must "identify or submit some competent evidence" to support their claims. *Soto*, 882 F.3d at 872. Plaintiff's verified complaint may serve as an affidavit in opposition to summary judgment if based on personal knowledge and specific facts admissible in evidence. *Lopez v. Smith*, 203 F.3d 1122, 1132 n. 14 (9th Cir. 2000) (en banc). However, a complaint's conclusory allegations unsupported by specific facts, will not be sufficient to avoid summary judgment. *Arpin v. Santa Clara Valley Transportation Agency*, 261 F.3d 912, 922 (9th Cir. 2001). And, where a plaintiff fails to properly challenge the facts asserted by the defendant, the plaintiff may be deemed to have admitted the validity of those facts. *See* Fed. R. Civ. P. 56(e)(2).

The undersigned has carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties. The omission to an argument, document, paper, or objection is not to be construed that the undersigned did not consider the argument, document, paper, or objection. Instead, the undersigned thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate for purposes of issuing these Findings and Recommendations.

### B. Deliberate Medical Indifference

Because it is unclear from the pleadings whether Plaintiff was a prisoner or pretrial detainee at the time of the incidents alleged, the Court sets forth both the legal standards for

5

1   deliberate medical indifference applicable to prisoners and to pretrial detainees.

2                    1.   <u>Eighth Amendment Deliberate Medical Indifference</u>

3          Deliberate indifference to the serious medical needs of an incarcerated person constitutes

4   cruel and unusual punishment in violation of the Eighth Amendment. *See Estelle v. Gamble*, 429

5   U.S. 97, 104 (1976).  To maintain an Eighth Amendment claim premised on prison medical

6   treatment, the prisoner must show that officials were deliberately indifferent to his medical needs.

7   A finding of "deliberate indifference" involves an examination of two elements: the seriousness

8   of the plaintiff's medical need (determined objectively) and the nature of the defendant's response

9   (determined by defendant's subjective state of mind).  *See McGuckin v. Smith,* 974 F.2d 1050,

10  1059 (9th Cir.1992), *overruled on other grounds, WMX Technologies, Inc. v. Miller,* 104 F.3d

11  1133, 1136 (9th Cir.1997) (en banc).  On the objective prong, a "serious" medical need exists if

12  the failure to treat "could result in further significant injury" or the "unnecessary and wanton

13  infliction of pain." *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014).  On the subjective

14  prong, a prison official must know of and disregard a serious risk of harm. *Farmer v. Brennan,*

15  511 U.S. 825, 837 (1994).  Such indifference may appear when a prison official intentionally

16  denies or delays care, or intentionally interferes with treatment once prescribed. *Estelle,* 429 U.S.

17  at 104-05.

18         If, however, the official failed to recognize a risk to the plaintiff—that is, the official

19  "*should* have been aware" of a risk, but in fact was not—the official has not violated the Eighth

20  Amendment. *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 668 (9th Cir. 2021) (emphasis in

21  original).  That is because deliberate indifference is a higher standard than medical malpractice.

22  Thus, a difference of opinion between medical professionals—or between the plaintiff and

23  defendant—generally does not amount to deliberate indifference. *See Toguchi v. Chung*, 391

24  F.3d 1051, 1057 (9th Cir. 2004).  An argument that more should have been done to diagnose or

25  treat a condition generally reflects such differences of opinion and not deliberate indifference.

26  *Estelle*, 429 U.S. at 107.  To prevail on a claim involving choices between alternative courses of

27  treatment, a plaintiff must show that the chosen course "was medically unacceptable under the

28  circumstances," and was chosen "in conscious disregard of an excessive risk" to the plaintiff's

                                                6

1   health.  *Hamby v. Hammond*, 821 F.3d 1085, 1092 (9th Cir. 2016).

2          Neither will an "inadvertent failure to provide medical care" sustain a claim, *Estelle*, 429

3   U.S. at 105, or even gross negligence, *Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d

4   1062, 1082 (9th Cir. 2013).  Misdiagnosis alone is not a basis for a claim of deliberate medical

5   indifference.  *Wilhelm v. Rotman*, 680 F.3d 1113, 1123 (9th Cir. 2012).  A delay in treatment,

6   without more, is likewise insufficient to state a claim.  *Shapley v. Nevada Bd. of State Prison

7   Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985).  It is only when an official both <u>recognizes</u> and

8   <u>disregards</u> a risk of substantial harm that a claim for deliberate indifference exists.  *Peralta v.

9   Dillard*, 744 F.3d 1076, 1086 (9th Cir. 2014) (en banc).  A plaintiff must also demonstrate harm

10   from the official's conduct.  *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).  And the

11   defendant's actions must have been both an actual and proximate cause of this harm.  *Lemire*, 726

12   F.3d at 1074.

13                    2.  <u>Fourteenth Amendment Deliberate Medical Indifference</u>

14          The Ninth Circuit has held that the objective, not subjective, deliberate indifference

15   standard applies when evaluating a pretrial detainee's medical care claim.  *See Gordon v. County

16   of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018) (holding claims for violations of the right to

17   adequate medical care for pretrial detainees are evaluated under the objective standard set forth in

18   *Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016)).  The elements of a detainee's

19   medical care claim under the Fourteenth Amendment are: (1) the defendant made an intentional

20   decision with respect to the conditions under which the plaintiff was confined; (2) those

21   conditions put the plaintiff at substantial risk of suffering serious harm; (3) the defendant did not

22   take reasonable available measures to abate that risk, even though a reasonable official in the

23   circumstances would have appreciated the high degree of risk involved—making the

24   consequences of the defendant's conduct obvious; and (4) by not taking such measures, the

25   defendant caused plaintiff's injuries.  *Gordon*, 888 F.3d at 1124-1125.

26          "With respect to the third element, the defendant's conduct must be objectively

27   unreasonable, a test that will necessarily 'turn[ ] on the facts and circumstances of each particular

28   case.'"  *Castro*, 833 F.3d at 1071 (*quoting Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015);

1    *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  The "'mere lack of due care by a state official'

2    does not deprive an individual of life, liberty, or property under the Fourteenth Amendment."  *Id.*

3    (*quoting Daniels v. Williams*, 474 U.S. 327 330–31 (1986).  Thus, the plaintiff must "prove more

4    than negligence but less than subjective intent—something akin to reckless disregard."  *Castro*,

5    833 F.3d at 1071.

6                                   **III.  ANALYSIS**

7        **A.  Allegations in Plaintiff's Complaint**

8            The events giving rise to the Complaint took place at Kings County Jail and at various

9    offsite medical facilities.  (*See generally* Doc. No. 1).  The following allegations are set forth in

10   the Complaint.  On January 2, 2020, while Plaintiff was incarcerated at KCJ, Defendant Batchelor

11   discontinued Plaintiff's pain medication in preparation for an off-site medical appointment on

12   January 7, 2020.  (Doc. No. 1 at 3).  Plaintiff's pain medications consisted of Gabapentin 800 mg,

13   Baclofen 20 mg, and Tramadol 50 mg.  (Doc. No. 1 at 3).  Plaintiff had been taking the

14   medication for up to a year when they were discontinued.  (*Id.*).

15           After being transported to the appointment, Plaintiff learned that the appointment had

16   been cancelled on December 11, 2019, because of insurance issues.  (*Id.*).  Plaintiff requested to

17   be put back on his pain medication, but Defendant Batchelor removed Plaintiff from the list of

18   inmates to be seen regarding medical requests.  (*Id.* at 3-4).  On January 16, 2020, Plaintiff's

19   prescription for Tramadol 50 mg and Baclofen 20 mg were renewed, but not his prescription for

20   Gabapentin 800 mg.  (*Id.* at 4).  On January 27, 2020, Plaintiff began receiving Gabapentin 800

21   mg.  (*Id.* at 4).  On January 29, 2020, Plaintiff's prescriptions for Baclofen and Tramadol were

22   discontinued.  (*Id.*).  On January 30, 2020, Plaintiff's prescriptions for Baclofen and Tramadol

23   were renewed.  (*Id.*).  In total, Plaintiff "was deprived of receiving three (3) of [his]

24   medications[,] one of them for approximately twenty-five (25) days [and the other two] for

25   approximately seventeen (17) days."  (*Id.*).  During this time, Plaintiff "was in chronic pain[,]

26   unable to eat, sleep, or walk."  (*Id.*).

27           In a second claim, the Complaint alleges that on November 14, 2019, KCJ medical staff

28   informed Plaintiff that his Gabapentin and Tramadol prescriptions were discontinued by

1    Defendant Siddiqi.  (*Id*. at 5).  Two days later, Plaintiff met with Defendant Siddiqi and asked

2    him why he discontinued his medication, given Siddiqi's knowledge of Plaintiff's numerous

3    medical conditions.[4]  Siddiqi responded that it was the result of an error and renewed all of

4    Plaintiff's pain medications.  Plaintiff also discussed with Siddiqi the results of an MRI Plaintiff

5    underwent on September 5, 2019.  (*Id*. at 5).  Siddiqi asked him, "so what are they going to do for

6    you, are you going to have surgery?"  (*Id*.).  Plaintiff shook his head and said, "I need to see a

7    specialist . . . you are not a back or nerve specialist."  (*Id*.).  Siddiqi agreed and said, "one thing at

8    a time.  I'm going to put you in for pain management and see if they approve you that's all I can

9    do."  (*Id*. at 5-6).  The Complaint appears to allege that Defendant Siddiqi was also responsible

10   for Defendant Batchelor's above alleged failure to provide Plaintiff his pain medication because

11   Siddiqi "over see's [sic] NP Wendy in all her medical decisions an [sic] either approves or

12   disaproves [sic] of them an signs off on them or corrects them."  (*Id*. at 6).

13          Plaintiff states because he did not have his pain medication for two days, he "could not

14   eat, sleep or walk."  (*Id*. at 5).  He also suffered physical and emotional pain and could not stand

15   for long periods due to the pain.  (*Id*.).

16          In a third claim, Plaintiff alleges that despite multiple grievances regarding the deficient

17   medical care at Kings County Jail, "KCJ has refused to acknowledge the deficiencies in this

18   medical care system" causing him physical and emotional pain and suffering.  (*Id*. at 7)

19          As relief, Plaintiff seeks "proper medical care for [his] medical condition[,] a spinal

20   surgeon or specialist" and monetary damages of $500,000.00.  (*Id.* at 8).

21          **B.   Material Facts**

22                 **1.   Undisputed Material Facts**

23          Having reviewed the record, the undersigned finds the following facts to be material and

24   undisputed, unless otherwise noted.  The Court notes that Defendants included in their statement

25   of undisputed material facts an extensive recitation of the medical care Plaintiff received while at

---

26

27   [4] The Complaint notes that in 2005 Plaintiff's left kidney was removed.  (Doc. No. 1 at 5).  In 2007 he had back surgery on his "L-4."  (*Id*.).  In 2016 Plaintiff had a heart attack and two stents installed.  (*Id*.).  He also suffers from disc protrusions in his back.  (*Id*.).  As a result of these various conditions, Plaintiff is in

28   chronic pain and walks with a cane. (*Id*.).

KCJ beginning in January 2019.  (*See generally* Doc. No. 40-2).  Given that the events giving rise to Plaintiff's claims took place between November 14, 2019 and January 30, 2020, Plaintiff's preceding medical treatment history at KCJ is of only limited relevance and the Court thus does not find each of the referenced treatment appointments and prescriptions to be material here.

- On January 9, 2019, KCJ medical staff diagnosed Plaintiff with hypertension, chronic pain, and neuropathy.  (*Id*.).  A KCJ nurse prescribed gabapentin 400 mg twice a day for 90 days and baclofen 10 mg every night, or as needed for pain. (*Id*. at 61).  She also approved Plaintiff's request for a shoe chrono.  (*Id*.).

- Between January 2019 and May 2020, Plaintiff submitted various medical requests related to his back pain, sciatic nerve, chronic pain, and chest pain.  (*See* Doc. No. 40-6 at 2, 3, 5, 7, 8, 12-14, 16, 18).

- In response to his requests, Plaintiff saw medical providers on at least 26 occasions between January 2019 and May 2020, including routine examinations, spinal MRI, two emergency room visits, and various appointments with nurse practitioners, a licensed vocational nurse, a social worker, and primary care physicians.  (*See generally id*.).

- In response to Plaintiff's reports of various forms of physical pain, numerous KCJ medical providers, including Defendants Batchelor and Siddiqi, prescribed or adjusted Plaintiff's prescription for pain medication—including Acetaminophen, Tramadol, Baclofen, and Gabapentin—on more than 40 occasions.  (*Id*.).

- On August 23, 2019, Dr. Siddiqi saw Plaintiff for a chronic care visit.  (*Id*. at 106-113).  Dr. Siddiqi performed a neurological examination which was normal.  (*Id*. at 109-110).  Dr. Siddiqi noted Plaintiff walked with a cane, shifting his weight to the right leg. There was slight restriction of the range of motion of the left leg.  (*Id*. at 110).  Dr. Siddiqi ordered an x-ray and an MRI of Plaintiff's lumbar spine.  (*Id*. at 69).

- On September 5, 2019, Dr. William Taylor reviewed the MRI of Plaintiff's lumbar spine.  (*Id*. at 10-11).  His impression was a 3 mm left subarticular disc protrusion

10

at L1-2 and a 5 mm left foraminal disc protrusion at L5-S1 with slight posterior displacement of the descending left S1 nerve root.  (*Id*.).

- On November 21, 2019, Plaintiff submitted a medical request stating he did not understand why his gabapentin and tramadol were discontinued.  (*Id*. at 13).  Mr. Ignacio advised Plaintiff he would be added to the Medical Provider Sick Call.  (*Id*.).  Per the Medication Administration records, Plaintiff received both gabapentin and tramadol on November 21, 2019 at 12:47 AM.  (*Id*. at 57).  Plaintiff received gabapentin on November 22, 23, and 24, 2019, but one administration was cancelled on November 24, 2019.  (*Id*. at 58-59).  Tramadol was resumed on November 23, 2019.  (*Id*. at 58-59).

- On November 23, 2019, Dr. Siddiqi saw Plaintiff for complaints of lower back pain.  (*Id*. at 71-72).  Dr. Siddiqi examined Plaintiff and noted he was walking with a cane.  (*Id*. at 72).  He reviewed the MRI of the lumbar spine from September 5, 2019.  (*Id*.).  He noted there were disc protrusions at different levels.  (*Id*.).  He ordered gabapentin 800 mg, three times a day and tramadol 50 mg, three times a day.  (*Id*. at 53).  Dr. Siddiqi educated Plaintiff on back exercises.  (Id. at p. 73).

- On November 29, 2019, Robynn Weston, a nurse practitioner, ordered baclofen 20 mg, twice a day.  (*Id*. at 54).  On December 2, 2019, Dr. Siddiqi ordered tramadol 50 mg, three times a day.  (*Id*.).

- On December 4, 2019, Plaintiff was transported to see Kenneth Ejiogu, a nurse practitioner at LAGS Medical Center, after complaining of ongoing back pain.  (*Id*. at 36-43).  Mr. Ejiogu performed a physical examination.  (*Id*. at 40-41).  Nurse Ejiogu's assessments were lumbago, radicular neuropathy, chronic pain syndrome, and long-term opiate analgesic use.  (*Id*. at 41).  He noted Plaintiff was currently taking gabapentin 800 mg 1 tablet orally once a day, tramadol 50 mg 2 tablets every eight hours, and baclofen 10 mg 1 tablet orally twice a day.  (*Id*. at 42).  He planned to start Plaintiff on tramadol 50 mg four times and baclofen 10 mg three times a day.  (*Id*.).  The plan also included an epidural spinal block to

11

decrease inflammation of the nerve root.  (*Id*.).

- On December 5, 2019, Ms. Batchelor ordered tramadol 50 mg, four times a day, and baclofen 20 mg, three times a day.  (*Id*. at p. 256).  On December 23, 2019, Ms. Batchelor ordered gabapentin 800 mg, three times a day.  (*Id*. at 54).

- On January 2, 2020, Chantal Miranda, a medical assistant, noted that per the office staff at LAGS Medical Center in Fresno, all pain medication was to be withheld, including aspirin, for five days beginning today for Plaintiff's epidural injection on January 7, 2020.  (*Id*. at 72).  Plaintiff submits this information was not verified by Miranda on January 2, 2020, but this does not contradict with Defendants' statement, which merely asserts that Miranda's note in the file was entered on January 2, 2020.

- On January 3, 2020, Tiffany Mendonca, a licensed vocational nurse, noted Plaintiff's pain medications were discontinued the prior day due to an upcoming appointment.  (*Id*. at 72-73).  During a medication pass in the morning, Plaintiff complained of nausea, vomiting, diarrhea, chills, and pain.  (*Id*. at 72).  Ms. Mendonca noted Plaintiff was pale, and the hairs were raised on both arms.  (*Id*.).  Plaintiff reported he did not understand why he could not have anything for his back.  (*Id*.).  Ms. Mendonca advised him the medications were being withheld based on the directives of the specialist for his upcoming appointment.  (*Id*.).  Plaintiff also complained about how he felt and said "if this is what those meds are doing to me, then I don't want to take them anymore. I would rather take something else that won't make me feel this way.  I hate this feeling, this ain't me."  (*Id*. at 72-73).

- On January 7, 2020, Ms. Batchelor noted that per Plaintiff's consulting physician, his pain medications had been withheld for five days pending his appointment scheduled for January 7, 2020.  (*Id*. at 73).  However, the appointment had been rescheduled by the specialist to January 15, 2020.  (*Id*.).  The plan was to resume medications until January 10, 2020.  (*Id*.).  Batchelor ordered gabapentin 800 mg,

three times a day.  (*Id*. at 54).

- On January 10, 2020, Plaintiff submitted a request for renewal of his medication. (*Id*. at 14).  He noted: "I don't understand why you would discontinue my heart medication for no just cause or reason.  Please renew them.  Also, my gabapentin, tramadol, an [sic] baclofen.  Why do you continue to do this for no reason is wrong.  I'm in chronic pain do [sic] to your wrong doings.  Please renew them." (*Id*.).

- On January 11, 2020, William Tejereso, a registered nurse, entered a message to StatCare to restart the pain medications that were discontinued for the epidural injection.  (*Id*. at 73).  On January 12, 2020, Mr. Huls responded to Plaintiff's request for medication renewal indicating Plaintiff was ordered to have no pain medications and to see a pain management specialist.  (*Id*. at 14).

- On January 15, 2020, Plaintiff was transported to Mr. Ejiogu for a follow-up appointment.  (*Id*. at 29-35).  Mr. Ejiogu performed a physical examination and noted normal thoracolumbar range of motion with positive testing on the left side. (*Id*. at 33). Plaintiff was taking gabapentin 800 mg 1 tablet orally once a day, tramadol 50 mg 1 tablet four times a day, and baclofen 10 mg 1 tablet orally three times a day.  (*Id*. at 31).  The epidural injection was canceled and rescheduled for February 4, 2020. (*Id*. at 34).  The plan was to renew the tramadol and baclofen. (*Id*.).  Mr. Ejiogu also ordered Plaintiff to have an electromyelogram (EMG) to evaluate radicular neuropathy.  (*Id*.).

- On January 15, 2020, Ms. Batchelor ordered tramadol 50 mg, three times a day, and baclofen 10 mg, three times a day.  (*Id*. at 54).

- On January 21, 2020, Plaintiff was transported to Dr. Mahendra Nath, a physical medicine and rehabilitation specialist, for an EMG.  (*Id*. at 15).  Plaintiff complained of lower back pain that radiated to the bilateral lower extremities, left greater than right.  (*Id*.).  He also had been experiencing paresthesia, shocking, and burning in the bilateral lower extremities, left greater than right.  (*Id*.).  Dr. Nath

13

noted Plaintiff had lumbar surgery in 2005.  (*Id*.).  Dr. Nath performed a physical

examination and noted the sensation was intact to light touch bilaterally in the

lower extremities.  (*Id*.).  Dr. Nath performed an EMG.  His impressions were a

normal bilateral lower nerve conduction study and bilateral lower needle EMG;

there was no electrodiagnostic evidence of large fiber peripheral polyneuropathy.

(*Id*.).

- On January 26, 2020, Ms. Mendonca noted Plaintiff was asking why his

  gabapentin had not been restarted.  (*Id*. at 6).  He complained of pain to his left leg

  and stated he could not put weight on it.  (*Id*.).  He also complained of leg tremors.

  (*Id*.).  Ms. Mendonca advised Plaintiff he was on the list to see a provider.  (*Id*.).

  On January 27, 2020, the next day, Ms. Batchelor ordered gabapentin 800 mg,

  three times a day. (*Id*. at 54).

- On January 29, 2020, Plaintiff submitted a medical request for renewal of his

  tramadol and baclofen.  (*Id*. at 16).  Mr. Huls advised Plaintiff the medications had

  been ordered for two weeks and he would be added to the Medical Provider Sick

  Call.  (*Id*.).

- On January 30, 2020, Plaintiff submitted a medical request to see a physician or a

  nurse practitioner for his back problems.  (*Id*. at 17).  Mr. Ignacio advised Plaintiff

  his medications (baclofen and tramadol) were restarted on January 30, 2020.  (*Id*.).

  Stephanie Ramirez, a medical assistant, entered a note that LAGS Surgery Center

  called with instructions on the upcoming appointment for the epidural injection.

  (*Id*. at 73). Ms. Batchelor ordered tramadol 50 mg, three times a day, and baclofen

  10 mg, three times a day.  (*Id*. at 55).

- On February 4, 2020, Ms. Ramirez noted transport called and advised her

  Plaintiff's epidural injection scheduled for February 4, 2020 needed to be

  rescheduled due to shortage of staff.  (*Id*. at 73).  Ms. Ramirez rescheduled the

  procedure.  (*Id*.).

- On February 13, 2020, Ms. Mendonca noted Plaintiff's tramadol and baclofen

prescriptions had expired.  (*Id*. at 74).  She spoke to Ms. Batchelor who gave a verbal authorization to refill the medications if there were no conflicting offsite appointments scheduled.  (*Id*.).  Ms. Mendonca confirmed with Ms. Ramirez that Plaintiff had an upcoming appointment and could not have baclofen but could have tramadol.  (*Id*.).  Ms. Batchelor ordered tramadol 50 mg, three times a day.  (*Id*. at 55).

- On February 20, 2020, Plaintiff was transported to see Dr. Thomas Jacques, who performed left L5 and S1 transforaminal epidural injections.  (*Id*. at 26-28).  Plaintiff reported pre-operative pain as 8/10 and post-operative pain as 0/10.  (*Id*. at 27).

- On February 20, 2020, Ms. Batchelor noted Plaintiff returned from his offsite visit.  (*Id*. at 74-75).  The plan was to continue the previous medications.  (*Id*. at 74).  She ordered baclofen 20 mg, three times a day; tramadol 50 mg, four times a day; and gabapentin 800 mg, three times a day.  (*Id*. at 55).  On February 26, 2020, Ms. Batchelor ordered gabapentin 800 mg, three times a day.  (*Id*.).

- On February 28, 2020, Plaintiff was transported to Tilksew Tedla, a nurse practitioner who specialized in pain management, for a follow-up.  (*Id*. at 19-25).  Plaintiff stated that his pain without medications was a 10/10 and 6/10 with medications.  (*Id*. at 20).  He was taking gabapentin 800 mg 1 tablet orally once a day, tramadol 50 mg 1 tablet four times a day, and baclofen 10 mg 1 tablet orally three times a day.  (*Id*. at 22).  Ms. Tedla performed a physical examination.  (*Id*. at 23-24).  Her assessment was lumbar radiculopathy and small fiber neuropathy.  (*Id*. at 24).  She recommended baclofen 20 mg, three times a day, and tramadol 50mg, four times a day.  (*Id*.).  She directed Plaintiff to follow-up in four weeks.  (*Id*.).

- On February 28, 2020, Marsha Burgess, a nurse practitioner, ordered tramadol 50 mg, four times a day, and baclofen 20 mg, three times a day.  (*Id*. at 55).

- On March 9, 2020, Plaintiff submitted a request for renewal of tramadol.  (*Id*. at

18).  Mr. Huls advised he would be added to the Medical Provider Sick Call.  (*Id*.).
On March 11, 2020, Ms. Batchelor ordered tramadol 50 mg four times a day.  (*Id*. at 55).

- On March 27, 2020, Plaintiff was transported to see Mr. Ejiogu for a follow-up. (*Id*. at 44-45).  Plaintiff complained of increased pain.  (*Id*. at 45).  Mr. Ejiogu recommended increasing tramadol to 100 mg three times a day, and continued baclofen and gabapentin.  (*Id*.).  Additionally, he recommended physical therapy. (*Id*.).

- On March 27, 2020, Ms. Batchelor ordered gabapentin 800 mg, three times a day. (*Id*. at 55).  Casey Gladney, a nurse practitioner, ordered tramadol 50 mg, two tablets three times a day.  (*Id*.).  On March 30, 2020, Ms. Batchelor ordered baclofen 20 mg, three times a day.  (*Id*.).

- On April 1, 2020, Ms. Batchelor ordered tramadol 50 mg, two tablets three times a day.  (*Id*. at 55).

- On April 26, 2020, Ms. Batchelor ordered gabapentin 800 mg, three times a day. (*Id*. at 55).  On April 30, 2020, she ordered baclofen 20 mg, three times a day. (*Id*.).

- On May 20, 2020, Ms. Batchelor noted Plaintiff's offsite visit for pain management was delayed due to COVID-19 restrictions.  (*Id*. at 76).  She noted Plaintiff's pain continued to be managed with medications.  (*Id*.).  The plan was for the referral to be deferred for four weeks.  (*Id*.)

- On May 20, 2020, Nicole Cotton, a licensed vocational nurse, saw Plaintiff for complaints of low back pain, worse with ambulation and standing.  (*Id*.).  Plaintiff reported he was unable to ambulate without assistance and rated his pain 10/10. (*Id*.).  Ms. Cotton spoke to Ms. Batchelor who ordered a ketorolac injection.  (*Id*. at 56).  Ms. Cotton administered the injection to the left and right gluteus maximus.  (*Id*. at 76).

- On May 26, 2020, Ms. Batchelor ordered gabapentin 800 mg, three times a day.

(*Id*. at 56).  On May 31, 2020, Ms. Batchelor ordered baclofen 20 mg, three times a day.  (*Id*.).

### 2.  Plaintiff's Statement of Disputed Facts

Plaintiff's Opposition points to various factual discrepancies or procedural issues that he alleges establish a genuine dispute of material fact.  For the reasons discussed further below, the Court finds Plaintiff's statements do not set forth a genuine dispute as to any material fact.

- Plaintiff contends Defendants Batchelor and Siddiqi's Motion for Summary Judgment was untimely filed because under Rule 56(c) a motion for summary judgment can be made up to 30 days after close of discovery and the close of discovery in this case was 1/20/2023.  (Doc. No. 44 at 4 ¶ 1).  The Court notes that it has the inherent authority to establish case management deadlines for the cases on its docket.  The Discovery and Scheduling Order issued in this case, issued on May 23, 2020, set the deadline for dispositive motions on April 20, 2023.  (See Doc. No. 36).  Because all Defendants filed their MSJs by the April 20, 2023 deadline, (*see* Docket), the respective MSJs were timely.

- Plaintiff states he had a deposition[5] at KCJ and complains that Defendants failed to provide him with a copy of this deposition.  Plaintiff claims the deposition "could [have] been helpful during these proceedings." (*Id*. ¶ 2).  This is not a material fact bearing on whether Defendants violated Plaintiff's constitutional right, while incarcerated at KCJ, to adequate medical care.  Notably, no Defendant cites to Plaintiff's deposition or attaches excerpts from it that Plaintiff needs to refute.  *See* Local Rule 133(j).  Accordingly, whether Plaintiff was provided with a copy of his deposition transcript does not set forth a genuine dispute of material fact.  Further, Plaintiff did not in discovery seek to compel Defendants to produce a copy of his deposition transcript.  Moreover, even if he had, such motion likely would have been denied.  Plaintiff's *in forma pauperis* status does not entitle him to a free

---

[5] Plaintiff refers to this as a "disposition hearing" but the Court infers he is referring to a deposition.

1   copy of his deposition transcript.[6]

2   •   On January 18, 2019, Dr. Siddiqi noted Plaintiff requested gel cushion technology

3       insoles, which Dr. Siddiqi recommended.  (Doc. No. 40-6 at 4).   Defendants state

4       that Defendant Siddiqi "approved" the gel cushion insoles.  (Doc. No. 40-2 at 2 ¶

5       3).  Plaintiff disputes this characterization, noting that his medical records reflect

6       only that Siddiqi "recommended" the gel cushion technology insoles.  (Doc. No.

7       44 at 4 ¶ 3).  The Complaint does not assert a claim based on Plaintiff's request for

8       gel cushion insoles.  (See generally Doc. No. 1).  Thus, Plaintiff's statement does

9       not set forth a genuine dispute of material fact.

10  •   Plaintiff claims on June 21, 2019, Siddiqi stated he would refer Plaintiff for a

11      neurosurgery consult.  However, there is no documentation in Plaintiff's medical

12      records of Plaintiff ever being scheduled to see a neurosurgeon or a referral for

13      one.  (*Id*. ¶ 4).  The Complaint does not cite Defendant Siddiqi's alleged failure to

14      order a neurosurgery consult as a basis for a constitutional claim.  (*See generally*

15      Doc. No. 1).  Thus, Plaintiff's statement does not set forth a genuine dispute of

16      material fact.

17  •   Plaintiff disputes that he received gabapentin and tramadol on November 21, 2019

18      and beyond November 23, 2019.  (*Id*. ¶ 5).  He points to a limited excerpt of his

19      *drug order* records, but this is contradicted by the more complete records of *drug*

20      *administrations*, which show the time and date that Plaintiff was administered

21      various prescribed drugs.  These records show that Plaintiff received both

22      gabapentin and tramadol on November 21, 2019 at 12:47 AM.  (*Id*. at 57).

23      Plaintiff also received gabapentin on November 22, 23, and 24, 2019, but one

24      administration was cancelled on November 24, 2019.  (*Id*. at 58-59).  Tramadol

25

26  [6] *See Tedder v. Odel*, 890 F.2d 210, 212 (9th Cir. 1989) (finding plain language of § 1915 did not waive
    payment of fees or expenses for witnesses); *see also Boston v. Garcia*, 2013 WL 1165062 *2 (March 20,
27  2013) (denying inmate plaintiff's motion for free copy of deposition transcript at the discovery stage of the
    proceedings); *Joseph v. Parciasepe*, 2016 WL 2743448 *4 (E.D. Ca. May 11, 2016) (denying motion to
    compel production of deposition transcript for free at the discovery stage of the proceedings).

28

1     was resumed on November 23, 2019.  (*Id.* at 58-59).  Thus, there is no genuine

2     dispute that Plaintiff received the drugs as Defendants attests.

3     • Plaintiff contends that his January 7, 2020 appointment was never verified nor

4        confirmed before his pain medications were discontinued.  (*Id.* ¶ 6).  Failure to

5        verify an appointment does not demonstrate deliberate indifference.  Nor does the

6        operative pleading assert facts showing it was Defendant Batchelor's responsibility

7        to reconfirm the appointment, or that she received notice of the cancellation and

8        intentionally disregarded it.

9     • Plaintiff contends that Defendants have not pointed to any documentation showing

10       that Plaintiff's procedure appointment was rescheduled to January 15, 2020.  "NP

11       Wendy knew Plaintiff had a follow up appointment for pain management in the

12       city of Hanford on January 15, 2020 and not a procedure appointment."  (*Id.* ¶ 7).

13       However, contemporaneous notes in the record show that Plaintiff's appointment

14       was rescheduled to January 15, 2020.  And that it was later again rescheduled.

15    • Plaintiff notes that, although Nurse Tejereso put him on the priority list to be seen

16       regarding his request for pain medication, "Plaintiff was never seen."  (*Id.* ¶ 8).

17       Even if true, this fact is not a material because it does not demonstrate deliberate

18       indifference on the part of either named Defendant.  Further, this fact does not

19       appear disputed because Defendants did not say they saw him on that date, only

20       that the nurse put him on the priority list.

21    For the reasons set forth above, the discrepancies Plaintiff points out between his statement of

22    facts and that of Defendants Batchelor and Siddiqi do not, standing alone, establish a genuine

23    dispute as to any fact material to the claims alleged.

24           **C.    Defendant's Proposed Expert Testimony**

25           Defendants refer to Dr. Alfred Joshua's opinion testimony as "expert" testimony seeks to

26    qualify him as an expert based on his education, background, training, knowledge, and substantial

27    experience, coupled with his review of Plaintiff's medical records.  (Doc. No. 40-3 at 2).  Federal

28    Rule of Evidence 702 governs the admissibility of expert testimony and provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify if the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based upon sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the witness has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Rule 702 requires that expert testimony be both "reliable and relevant" whether based on scientific, technical, or other specialized knowledge." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999).

Dr. Joshua is licensed in California as a physician and surgeon and has been board certified in Emergency Medicine since 2012.  (Doc. No. 40-7 at 2).  He has experience as an emergency medicine physician, in primary care, and in correctional medicine and administration, including serving as Chief Medical Officer for the San Diego County Sheriff's Medical Services Division.  (*Id*. at 2-3).  He received a Certification for Certified Correctional Health Care Professional from the National Commission of Correctional Healthcare.  (*Id.* at 2).  Dr. Joshua has an extensive list of presentations, publications, including books, and has testified or been deposed as an expert (and not disqualified) in 33 different federal actions in the last four years.  (*Id*. at 3-6).  In formulating his opinions, Dr. Joshua relied upon his education, training, knowledge, and professional experience in the correctional healthcare field, and reviewed the following materials: (1) the Complaint; (2) the National Commission of Correctional Health Standards, Jails 2018; (3) Naphcare Medical Records; and (4) the Screening Order in Plaintiff's case.  (*Id*. at 6).

Dr. Joshua opines that:

> Mr. John Anthony Reyna received not only the standard of care while he was incarcerated at Kings County Jail but also Naphcare and its providers which included Dr. Nareem Siddiqi and Nurse Practitioner Wendy Bachelor acted reasonably and purposefully and did not show any indifference or deviations to the standard of care

20

1
2
3
4

> with respect to the medication and clinical management of Mr. Reyna.  It is also clear based on the medical notes that the clinical actions taken by NP Wendy Batchelor were based on the recommendations of the surgeon at the offsite clinic so that the lumbar epidural injection could be completed to alleviate Mr. Reyna's lumbar back pain.

*Id*. at 8.  Other than referring to Dr. Joshua as a "high priced" witness offering a "one-sided opinion," Plaintiff does not challenge Dr. Joshua's qualification as an expert of his testimony under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).

The Court finds Dr. Joshua's education, training, credentials, and experience qualifies him as an expert.  The Court further finds Dr. Joshua's testimony set forth in his declaration both relevant and admissible.  Thus, the Court accepts Dr. Joshua's opinion as expert testimony under Federal Rules of Evidence 702 as to whether the medical care Defendants provided Plaintiff was appropriate and met the standard of care.

### D.  Neither Dr. Siddiqi nor Nurse Batchelor Acted with Deliberate Indifference

The undersigned first must consider whether Defendants, as the moving parties, have met their initial burden of showing *prima facie* entitlement to summary judgment on the issue of Plaintiff's medical deliberate indifference claim.  *Celotex Corp.*, 477 U.S at 323.  The *prima facie* elements of medical deliberate indifference are:  (1) a "serious medical need[,] [where] failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain" and (2) the defendant's "response to the need was deliberately indifferent."  *Wilhelm*, 680 F.3d at 1122 (internal quotation marks and citation omitted).  The second prong is satisfied by showing "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference."  *Jett*, 439 F.3d at 1096 (internal citations omitted).

Alternatively, because it is unclear whether Plaintiff was a pretrial detainee at the time of the events alleged, Plaintiff may be able to state a Fourteenth Amendment claim by demonstrating that (1) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (2) those conditions put the plaintiff at substantial risk of suffering serious harm; (3) the defendant did not take reasonable available measures to abate that risk, even though

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1    a reasonable official in the circumstances would have appreciated the high degree of risk

2    involved—making the consequences of the defendant's conduct obvious; and (4) by not taking

3    such measures, the defendant caused plaintiff's injuries. *Gordon*, 888 F.3d at 1124-1125.

4        As set forth more fully below, the Complaint fails to show a genuine dispute of material

5    fact under either standard. Accordingly, the undersigned will recommend Defendants' motions

6    for summary judgment.

7        **1. Serious Medical Need**

8        A serious medical need is evidenced by "the existence of an injury that a reasonable

9    doctor or patient would find important and worthy of comment or treatment; the presence of a

10   medical condition that significantly affects an individual's daily activities; or the existence of

11   chronic and substantial pain are examples of indications that a prisoner has a 'serious' need for

12   medical treatment." *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on*

13   *other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc). Here, the

14   parties do not appear to dispute that Plaintiff had an ongoing serious medical need, particularly

15   chronic pain related his displaced discs and sciatica, along with various other physical ailments.

16   (*See* Doc. No. 1 at 5). These conditions were documented to varying degrees beginning in

17   January 2019, when Plaintiff was first incarcerated at KCJ. Voluminous entries in Plaintiff's

18   medical records reflect that these conditions were well-known to KCJ medical staff, including

19   Defendants, and that Plaintiff was prescribed pain medication, ordered diagnostics, and provided

20   other treatment over the course of months. (*See generally* Doc. No. 40-6). When viewed in the

21   light most favorable to Plaintiff, a reasonable jury therefore could find that Plaintiff had a serious

22   medical need resulting from his back condition and other health problems.

23       **2. Deliberate Indifference**

24       However, the second prong of medical deliberate indifference—failure to respond to a

25   prisoner's pain, resulting in harm—is absent from the record. *Jett*, 439 F.3d at 1096. A

26   defendant "cannot be said to have been indifferent" to an inmate's pain if they took steps to

27   address it." *DeGeorge v. Mindoro*, 2019 WL 2123590, at *7 (N.D. Cal. May 15, 2019). Here,

28   Defendants indisputably took steps to address Plaintiff's complaints of pain. Plaintiff received

1    more than two dozen medical appointments from January 2019 to May 2020, including

2    emergency treatment for chest pain, an MRI of his spine, numerous prescriptions for pain

3    medication, and many routine care visits in response to his medical requests.  Dr. Siddiqi and

4    Nurse Batchelor each ordered pain medication for Plaintiff on several occasions, as well as other

5    forms of specialized and follow-up care.  (*See generally* Doc. No. 40-6).

6        While the record reflects isolated occasions in November 2019 and January 2020 when

7    Plaintiff did not receive one or more of his usually prescribed pain medications, these instances

8    do not demonstrate deliberate indifference on the part of either Defendants.  When Plaintiff's pain

9    medications were discontinued on or about November 21, 2019, he filed a request for renewal of

10   his prescriptions and Defendant Siddiqi promptly responded two days later.  (Doc. No. 1 at 5).

11   Taking Plaintiff's' account as true, Siddiqi apologized and attributed the discontinuation to an

12   error.  (*Id*.).  An "inadvertent [or negligent] failure to provide adequate medical care" alone does

13   not state a claim under § 1983.  *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal

14   citations omitted).  Because the undisputed facts reflect that Plaintiff's pain medications lapsed

15   for two days due to an error, and then Defendant Siddiqi promptly renewed them, the Complaint

16   fails to demonstrate a genuine dispute as to whether Defendant Siddiqi was deliberately

17   indifferent to a serious medical condition.  Thus, the undersigned recommends dismissal of

18   Plaintiff's Eighth Amendment claim against Defendant Siddiqi.

19       The Complaint alleges that Defendant Batchelor was deliberately indifferent to his serious

20   medical need under various theories.  First, Plaintiff contends that she should have verified that

21   his January 7, 2020 appointment had not been cancelled before discontinuing his pain

22   medications on January 2, 2020.  (Doc. No. 44 at 8) ("If defendant's [sic] Wendy Batchelor or

23   Naeem Sidiqi would have followed up and confirm [sic] the Plaintiff's appointment on January 7,

24   2020 . . . defendants would have known Plaintiff's appointment was cancelled on December 11,

25   2019").  Plaintiff suggests the failure to do so was inconsistent with NaphCare policy.  (*Id*.).

26   However, the Court does not find in the attached policy any statement to that effect.  And if it did,

27   a mere failure by staff collectively to reconfirm Plaintiff's appointment would amount at most to

28   negligence.  There are no facts indicating that Defendant Batchelor knew Plaintiff's appointment

1   had been cancelled on January 2, 2020, when she temporarily discontinued Plaintiff's pain

2   medication for the anticipated appointment.  Further, when it came to light that Plaintiff's January

3   7, 2020 appointment had been rescheduled to January 15, 2020, Defendant Batchelor immediately

4   renewed Plaintiff's gabapentin 800 mg prescription through January 9, 2020, allowing Plaintiff

5   the prescribed five days without pain medication prior to his scheduled lumbar epidural injection.

6   (*See* Doc. No. 40-6 at 54).  After Plaintiff's injection was rescheduled again to February 4, 2020,

7   (*see id*. at 34), on January 15, 2020 Defendant Batchelor promptly renewed Plaintiff's

8   prescriptions for gabapentin, baclofen, and tramadol through January 28, 2020, again allowing the

9   prescribed five days prior to the scheduled epidural injection.  (*See id*. at 54).  Thus, her actions

10   reflect diligence in ensuring Plaintiff would retain access to his prescribed pain medication.

11         According to Plaintiff, he was receiving tramadol and baclofen from January 16 until

12   January 29, 2020, when they were discontinued for one day and resumed on January 30, 2020.

13   (Doc. No. 1 at 4).  Plaintiff did not receive his prescribed gabapentin from January 16 until

14   January 27, 2020, despite Defendant Batchelor having ordered them.  (*See id*; Doc. No. 40-6 at

15   54).  Plaintiff alleges that Defendant Batchelor cancelled various appointments he made during

16   this time to see her about his medication.  (Doc. No. 1 at 4).  Plaintiff apparently attributes the

17   fact that he did not receive all his pain medications during this time to Defendant Batchelor's

18   actions.  However, the record reflects that Batchelor took steps to ensure Plaintiff promptly

19   received continued access to all three of his prescribed pain medication, including promptly

20   ordered renewals after his offsite appointments.  (*See* Doc. No. 40-6 at 54).  The facts do not

21   reflect that Plaintiff's failure to receive the medications was due to any deliberate indifference on

22   Defendant Batchelor's part.  Nor is there any indication that Defendant Batchelor alone had

23   authority to ensure Plaintiff timely received the medication.  Rather, the pleadings reflect that

24   while a medical provider such as Defendant Batchelor could order medications, they had to be

25   approved by additional decision-makers, and thus could be subject to delays.  (*See, e.g.,* Doc. No.

26   1 at 6) (quoting Siddiqi as stating, "I'm going to put you in for pain management and see if they

27   approve you."); (*see also* Doc. No. 44 at 7) (registered nurse Huls advising Plaintiff that his

28   medication had been ordered for more than two weeks but had not yet come through).

1    The overwhelming record evidence shows that Defendants Batchelor and Siddiqi provided

2    attentive medical care to Plaintiff prior to, during, and after the period when he was briefly unable

3    to access some of his pain medication, including promptly renewing his medication when it was

4    inadvertently discontinued or paused due to rescheduling of his off-site appointment.  This is

5    consistent with Dr. Joshua's expert opinion.  Taken together, the record refutes Plaintiff's claim

6    of medical deliberate indifference.  Defendants are accordingly entitled to summary judgment as

7    to an Eighth Amendment deliberate medical indifference claim.

8    Nor does the alleged conduct rise to the level sufficient to state a claim under the arguably

9    more lenient Fourteenth Amendment standard.  Critically, the facts do not reflect that Defendants

10   Siddiqi or Batchelor failed to take reasonable available measures to abate the risk of harm or

11   suffering from Plaintiff's chronic medical conditions.  Indeed, the same facts cited above indicate

12   that both Defendants responded promptly to ensure Plaintiff's prescribed medications were

13   continued any time they were at risk of lapsing or had been inadvertently discontinued due to

14   impending outside medical appointments that were cancelled and rescheduled.  Thus, Defendants

15   Siddiqi and Batchelor are entitled to summary judgment as to a Fourteenth Amendment claim.

16   **E.  *Monell* Claim**

17   To establish municipal liability, a plaintiff must prove that (1) he or she was deprived of a

18   constitutional right; (2) the municipality had a policy; (3) the policy amounted to deliberate

19   indifference to a plaintiff's constitutional right; and (4) the policy was the "moving force" behind

20   the constitutional violation.  *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011).

21   While *Monell* claims of municipal liability do not arise from a respondeat superior theory,

22   *Monell*, 436 U.S. at 691, such claims still require that Plaintiff demonstrate a predicate violation

23   of constitutional rights.  *Scott v. Henrich*, 39 F.3d 912, 916 (9th Cir. 1994) (holding that

24   "municipal defendants cannot be held liable because no constitutional violation occurred"); *see*

25   *also City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (finding if no individual claim

26   against police officer remains, then no liability on city and the Police Commission).

27   Here, the undersigned recommends that Defendant KCJ's Motion for Summary Judgment

28   be granted because the record does not contain any genuine issue of material fact concerning

1   Plaintiff's Eighth Amendment/Fourteenth Amendment deliberate indifference to a serious

2   medical condition claim as to Dr. Siddiqi and Ms. Batchelor.  Thus, because no "underlying

3   constitutional violation" is present, Plaintiff's *Monell* claim fails as a matter of law.

4            Accordingly, it is **RECOMMENDED**:

5            1.  The district court GRANT Defendants Batchelor and Siddiqi's motion for summary

6   judgment (Doc. No. 40).

7            2.  The district court GRANT Defendant King County Jails' motion for summary

8   judgment (Doc. No. 41).

9            3.  The district court enter judgment in favor of all Defendants and against Plaintiff and

10  close this case.

11                              **NOTICE TO PARTIES**

12           These findings and recommendations will be submitted to the United States District Judge

13  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within fourteen (14)

14  days after being served with these findings and recommendations, a party may file written

15  objections with the Court.  The document should be captioned "Objections to Magistrate Judge's

16  Findings and Recommendations."  Parties are advised that failure to file objections within the

17  specified time may result in the waiver of rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834,

18  838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

19

20  Dated:    December 18, 2023

21                                         HELENA M. BARCH-KUCHTA
                                           UNITED STATES MAGISTRATE JUDGE
22

23

24

25

26

27

28